PHENIX INSURANCE COMPANY *v.* A. I. DORSEY ET AL.

[58 South. 778.]

1. INSURANCE. *Inventory. Place. Warranty.*

The requirement in a fire insurance policy that insured shall take a complete itemized inventory of stock on hand at least once a year, is not met where insured made out a bill of goods at his main store to be shipped to a branch store at another place and invoiced the goods to be charged to such branch store, there being no evidence that such goods were ever received at such branch store where they were insured.

2. SAME.

Property covered by a fire insurance policy is insured at the place named in the policy, and it is only such property as is located at that place that is covered by such insurance.

3. SAME.

Where the parties to a contract of insurance agree to take an inventory, this inventory, taken according to the contract, is the only evidence competent to prove any loss for which the company is liable, even though the property described in the policy is destroyed by fire.

102 Miss.—6

APPEAL from the chancery court of Tunica county.
HON. M. E. DENTON, Chancellor.

Suit by A. I. Dorsey et al. against the Phenix Insurance Company. From a judgment for plaintiffs, defendant appeals.

The facts are fully stated in the opinion of the court.

*J. W. Cutrer,* for appellant.

*Fontaine & Fontaine* and *Flowers, Alexander & Whitfield,* for appellee.

Counsel for both sides filed elaborate briefs too long for publication.

COOK, J., delivered the opinion of the court.

There are many singular features about this case, and, in order that the conclusions reached by us may be appreciated at their full value, a brief recital of the facts leading up to the litigation and a short history of the long drawn out litigation is deemed important.

In the month of September, 1902, the appellee, J. G. Smith, a resident of Pontotoc, Miss., established a general mercantile business in Sunflower county, Miss., placing the management of his business there in the hands of his brother, A. D. Smith. This business was continued until some time in June, 1903, when it is alleged that the storehouse and merchandise stored therein were destroyed by fire. In August, 1903, the general officers of the Phenix Insurance Company received a notice from Mr. Smith, stating that he held policy No. 33429 issued by the company covering said stock of goods, valued at five thousand dollars, and the house, valued at three hundred dollars. The insurance company, upon investigation, found that their agent, A. I. Dorsey, located at Tunica, Miss., reported policy No. 33429 as having been issued by him to cover his own personal effects, valued at two hundred and fifty dollars, and situated at Tunica.

It was also developed that Dorsey had reported to the insurance company that he had written policy No. ——, insuring the same property described by the policy claimed to be held by Smith, and bearing about the same date.

The records of the insurance company showed that the last-named policy had been promptly canceled by the insurance company upon receipt of Dorsey's report, and the policy had been returned to the company. It afterwards developed that Smith did have in his possession policy No. 33429, and it did cover the property alleged to have been burned. The company, after making further investigations, denied all liability under this policy, and, on the 2d day of October, 1903, filed in the chancery court of Tunica county its bill of complaint against Smith and Dorsey, charging a conspiracy between them to defraud the company, and praying that the policy be canceled as fraudulent and void.

Smith filed his answer to this bill on November 20, 1903, denying all the allegations of the bill. Depositions of witnesses for both parties were taken August 24, 1904, at which time the case of appellee was outlined and developed. Smith was present, but did not give his deposition, and did not testify at all until March 31, 1910. The case moved along until April 23, 1907, when Smith obtained leave to make his answer a crossbill, praying for a decree against the insurance company for the amount covered by the policy. What we wish to emphasize is that the answer of Smith was not made a crossbill, and no affirmative relief was asked by Smith, until four years after the fire and alleged loss, and that he did not testify in his own behalf until March 31, 1910, nearly seven years after the beginning of this litigation.

Many other anomalous circumstances were developed in the case, but it is unnecessary to mention them all. Smith's answer and cross-bill prayed for a reformation of the policy because of a mutual mistake in the loca-

tion of the property upon which the risk was assumed.
The policy produced by Smith bears no date. It pur-
ports to cover the property from November 9, 1902, to
November 9, 1903, and it thus appears that Smith's prop-
erty was insured for thirty days prior to the time he
applied for insurance, according to his own testimony.
The policy located the property in one place, whereas, in
fact, the property was located in an entirely different
place. Smith testifies that his brother filled out a writ-
ten application for this policy and brought it from Pen-
tecost to Pontotoc for his inspection and approval, and
that this application correctly described the location and
ownership of the property; that he, in person, mailed
the application to Dorsey, the agent, and Dorsey, in
writing the policy, made a mistake in the location and
ownership of the property to be insured; that Dorsey
insured his property for one month before the applica-
tion for insurance was mailed to him. This application
for insurance was never seen by any officer of the insur-
ance company, and it disappears from view after Smith
mailed it to Dorsey.

It develops later that Smith had never been to Pente-
cost until after the fire and had never seen the house
insured, and while he does say that Dorsey delivered
the policy about the 6th of March, 1903, yet it fully ap-
pears that he received this information from his brother,
if at all. In fact, Smith knew nothing of value to this
controversy, except what his brother is alleged to have
told him, and we think it is clear from Smith's own dep-
osition that he never saw the policy of insurance until
after the fire.

Among other matters in controversy is the alleged fail-
ure of Smith to pay the premium on the policy, and
while, ordinarily, this may not be important, if Dorsey
is to be treated as the general agent of the insurance
company, yet it must be borne in mind that the original
bill was filed to cancel this policy because of an alleged

combination and conspiracy between the agent of the company and the assured to defraud the company, and any circumstance, or combination of circumstances, tending to establish this charge is manifestly pertinent.

Let it be noted here that A. D. Smith, the brother and manager of the business of the insured at Pentecost, never testified in this case, and that he departed this life some time after the fire. To meet the charge of the company that the premium was not paid to the company, or to Dorsey, J. G. Smith testifies that the premium was paid February 3, 1903, two months after the application for insurance, and one month before the policy of insurance was delivered to his brother, A. D. Smith, and three months subsequent to the date when the policy on its face took effect. To recapitulate: The policy on its face covers the period between November 9, 1902, and November 9, 1903. When the policy was actually issued nowhere appears, the policy bearing no date of issuance; but it does appear that the policy is written to cover a period one month previous to the date upon which Smith says the application was made and mailed to Dorsey, and we think there is no evidence to show that the policy was delivered until after the fire. Coming back to the question: Was the premium paid, or was it a part of the alleged scheme between Smith and Dorsey that any premium should be paid?

Smith proceeds to tell about the payment of the premium, and nearly all of his testimony is pure hearsay, and, therefore, no evidence at all. However, he does say that his brother told him that he paid the premium to Dorsey, and that his brother exhibited to him a receipt signed by Dorsey, and that, out of an abundance of caution, he proceeded to copy said receipt, thus preserving secondary evidence of the receipt, which seems to have vanished.

It is proper to say here that the learned chancellor resolved all of these questions of fact in favor of Smith,

and as the findings of fact by the chancellor must be given the force and effect of the verdict of a jury, we simply recite the facts for whatever bearing they may, and do, have upon the decision of this court. All of these things appear in the record, and there is nothing to explain them, and we think they help to solve the final problem in this case.

The policy upon which Smith sought and obtained a decree against appellant contains this covenant, to wit: "The following covenant and warranty is hereby made a part of this policy: (1) The assured will take a complete itemized inventory of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within thirty days of issuance of this policy, or this policy shall be null and void from such date, and upon demand of the assured the unearned premium from such date shall be returned." The chancellor in his decree finds that this covenant and warranty was fully complied with, and, if he is wrong about that, all of his other findings of fact are without effect, and the cross-bill of assured should have been dismissed, and the prayer of the original bill should have been granted.

There can be no serious contention that an "inventory of stock on hand" was ever taken by Smith or his manager at the place where the goods are alleged to have burned. This inquiry must be confined to the existence of the goods at the place where the insurance company insured them against loss by fire. And this is not all. No mere proof that there was some merchandise, or a large stock of merchandise, *in situ* at the time of the fire, can be substituted for an inventory. No amount of evidence, however convincing, as to the value of the goods lost, can suffice to abrogate the covenant and warranty. The parties to the contract agreed to take an inventory, and this inventory, taken according

to the contract, is the only evidence competent to prove
any loss for which the company is liable, even though
it be conceded that the property described in the policy
was destroyed by fire.   The courts will not attempt to
limit the right of contract, and no court can make a con-
tract which was never agreed to by the parties to the con-
tract.   Courts are not authorized to modify, add to,
or subtract from the terms of a valid contract, and this
contract providing for an inventory was entirely valid,
imposed no hardship, but provided a business method
whereby the rights of the parties could be ascertained
and adjusted.

Appellee, Smith, undertook to show that the contract
for the taking of an inventory had been complied with,
or at least that there was a substantial compliance with
the terms of the covenant and warranty.   He says that
he made out a bill of the goods shipped to Pentecost at
the time the goods were being taken from his store in
Pontotoc to be shipped to his store at Pentecost.   In
other words, he made an invoice at Pontotoc of goods
charged to his store at Pentecost, and while this court
has decided that "an invoice of goods by which they
were purchased was not the sort of inventory contem-
plated by the policy," in *Insurance Co.* v. *Bank,* 71 Miss.
614, 53 South. 933, we think such circumstances might
arise whereby an invoice could be treated as an inven-
tory within the meaning of the policy; but it is our
opinion that the invoice made at Pontotoc by Smith can-
not be treated as an inventory in the instant case.   There
is not a shred of evidence in the entire record tending
to show that the goods invoiced at Pontotoc ever reached
Pentecost.   Smith says that the invoice at Pontotoc was
made out as the goods were shipped out, and that the
goods were shipped to Pentecost, which means, of course,
that the goods were delivered to some means of convey-
ance at Pontotoc.   He does not say by what means the
goods were shipped, or that they were ever sent out of

Pontotoc, but leaves all of this to be conjectured, or supplied, which conjecture may or may not be the real facts. There are so many things that are peculiar and unusual and so much is left to be presumed.

It must be presumed that the goods were carried to Pentecost, and when they reached their destination they were carried to the store just as they were invoiced at Pontotoc, that they were all intact, and every item was checked and found to be the same in value and condition as they were when they were invoiced at Pontotoc, or appellee must lose his case. There is not a scintilla of proof that the goods, or any part of same, ever reached Pentecost; but if we indulge in the presumption that the goods in some way and at some time did find their way to Pentecost, because Smith says he shipped them from Pontotoc, we are yet far from establishing that the invoice taken at Pontotoc constituted or supplied the place of a "complete itemized inventory *of stock on hand.*" There is absolutely no evidence to show that the agent of Smith at Pentecost had the invoice in his possession when the goods are presumed to have arrived at Pentecost, and that he checked the goods with the invoice; and until this is shown, no court has ever held that an invoice of goods made at one place can supply the functions of an inventory of stock on hand at quite another place.

The property was insured at a place named in the policy, and does not assume the risk at any other place, and in order to have some basis of value for a stock of merchandise destroyed by fire, the policy provides for an inventory of the goods on hand and in the store where they are insured. This inventory, in connection with the books of account, affords a reasonable index to the value of the stock burned. It is conceded for the purposes of this decision that the invoice taken at Pontotoc could have been made an inventory such as was called for by the policy; but nothing having occurred, so

far as the record discloses, to warrant the holding that this invoice became in any sense an inventory of the sort contemplated by the policy, we hold that the chancellor erred in rendering a decree against appellant.

*Reversed and remanded.*