Carroll HOOD, Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY and Mutual Insurance Agency, Defendants.

FIREMAN'S FUND INSURANCE COMPANY, Third-Party Plaintiff,

v.

MUTUAL INSURANCE AGENCY, Third-Party Defendant.

Civ. A. No. J75–63(N).

United States District Court, S. D. Mississippi, Jackson Division.

March 25, 1976.

James P. Cothren, Jackson, Miss., James E. Lever, Hazelhurst, Miss., for plaintiffs.

James L. Carroll, Richard M. Edmonson, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

This suit was filed in the Chancery Court of Copiah County, Mississippi by way of Chancery attachment against a non-resident, by plaintiff, Carroll Hood, against the defendant, Fireman's Fund Insurance Company, on an insurance policy issued to the plaintiff by the defendant through Oliver W. Catchings, Jr. and C. Richard Hartung,

d/b/a Mutual Insurance Agency (Mutual) pursuant to an agency agreement entered into between Mutual and Fireman's Fund (Ex. G–8). Fireman's Fund issued its policy number MSP–173 50 92 effective April 11, 1974, a binder having been issued by Mutual as of that date when the plaintiff applied to it for this policy in the amount of $50,-000.00 covering 200 head of cattle valued at $250.00 each and located in Copiah County, Mississippi.

The defendant removed this case and thereafter joined Mutual[1] as a third party defendant. Subsequently, plaintiff amended and made Mutual an additional defendant herein. Although we herein award no relief based on the latter claim, as will be further discussed, we deem it appropriate to comment briefly on the jurisdictional aspects thereof.

■ Although plaintiff's Motion to Amend to name Mutual as a defendant was agreed to by all parties, this Court exercised its power to conduct a jurisdictional inquiry on its own initiative, inasmuch as there is no diversity between plaintiff and Mutual (Catchings and Hartung). *Warren G. Kleban Engr. Corp. v. Caldwell,* 490 F.2d 800 (5th Cir. 1974). The issue of whether an independent jurisdictional ground must exist in order for a diversity plaintiff to assert a claim directly against a non-diverse third-party defendant has never been decided by the Fifth Circuit, although it has in dicta pointed out that the vast weight of authority requires the existence of such grounds. *Revere Copper & Brass, Inc. v. Aetna Cas. & Surety Co.,* 426 F.2d 709, 716 at n. 9 (5th Cir. 1970). Nevertheless, we have concluded that based upon *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), as analyzed in *Morgan v. Serro Travel Trailer Co.,* 69 F.R.D. 697, 44 U.S.L.W. 2334 (D.Kan., 1975), and in the interest of judicial economy and the avoidance of possibly varying and inconsistent results, the minority is the better reasoned rule on this issue, and this Court has ancillary jurisdiction to entertain plaintiff's claim against Mutual.

The principal issues are whether plaintiff has proved that 61 head of insured cattle were lost through drowning, an insured peril; if so, whether the plaintiff is precluded from recovering from Fireman's Fund because of failure to comply with the "written notice" and "proof of loss" requirements of the policy; if he is not entitled to recover from Fireman's Fund, whether he is entitled to recover from Mutual because of its failure to immediately notify Fireman's Fund of the alleged loss when plaintiff gave Mutual verbal notice thereof within approximately one week thereafter; and if plaintiff is entitled to recover against Fireman's Fund, whether it in turn is entitled to recover against Mutual for the amount of its damages for payment of the claim because of Mutual's above failure.

On April 11, 1974, the plaintiff applied to Mutual for a livestock floater policy of insurance to insure 200 head of cattle located on two different farms in Copiah County, Mississippi, the Templeton place and the Massey place. Mutual bound the coverage on the above date and submitted an application in due course to Fireman's Fund which issued its livestock floater policy in question on April 24, 1974, effective April 11, 1974, insuring the 200 head of cattle for the sum of $250.00 each, or $50,000.00. One of the perils insured against under the policy was death or destruction by drowning. The policy was mailed from New Orleans to Mutual about April 24, 1974 but was not delivered to the plaintiff by Mutual until sometime in the middle or latter part of May, 1974.

On April 13, 1974, a creek or bayou known as Bayou Pierre which formed one of the boundaries of the plaintiff's "Templeton Place" severely flooded as a result of heavy rains, causing the water to rise above its 50 foot high cliff banks inundating approximately 99% of plaintiff's land on which 107 head of the insured cattle (cows) as well as three uninsured charolois bulls

1. Although the pleadings name Mutual Insurance Agency, the unopposed ore tenus motion of plaintiff and Fireman's Fund to amend in order to properly designate that defendant and third party defendant as Catchings and Hartung d/b/a Mutual Insurance Agency was granted by the Court at the conclusion of this trial.

were located. This flooded condition existed for several days thereafter.

Bayou Pierre, a body of water which varies in width between 15 and 40 feet, is approximately 3 to 5 feet deep at its normal stage, emptying into the Mississippi River. When it flooded on the date in question its current moved very rapidly and forcefully. Upon being informed of the fact that it was beginning to flood the Templeton place, located approximately 8 to 12 miles from Hazelhurst, Mississippi, and which consists of 227 acres of fenced delta type land bordering Bayou Pierre for a distance of approximately one mile, plaintiff went onto the land on April 13, found the water rising and heard some of his cows "blowing". He swam a smaller creek which traversed his land and cut a barbed wire fence between his place and the higher adjoining land of S. E. Templeton in order to permit his cattle onto the latter land to avoid drowning.

Mr. Hood attempted to reenter the land some three or four days later but was unable to do so because it was still flooded, and he was unable to get onto the land for approximately six or seven days subsequent to April 13 at which time he saw several drowned cows, the number of which he did not count, and was unable to determine the exact extent of his loss because of the flooded conditions that still existed.

Within approximately one week after April 13, Hood called his insurance agent and brother-in-law, Oliver W. Catchings, one of the partners who owned and operated Mutual, and verbally informed him that he had probably sustained a loss of cattle on the Templeton place as a result of flooding but that he did not know the exact extent of his loss at that time. When this phone call was made, the policy in question had not been delivered to the plaintiff, and Catchings told him that he should "give him a number" of cows lost as a result of the flood as soon as he could do so. At this time, Catchings (Mutual) knew that the policy which would be issued would contain the following clause, which it does contain in paragraph 2 of "Conditions" (Ex. G–1):

"2. Notice of Loss. The Insured shall as soon as practicable report in writing to the Company or its agent every loss, damage or occurrence which may give rise to a claim under this policy and shall also file with the Company or its agent within ninety (90) days from date of discovery of such loss, damage or occurrence, a detailed sworn proof of loss."

However, Catchings did not at that time nor at any subsequent time inform Hood of either of these two requirements despite several subsequent conversations with him concerning the reported loss nor did he ever furnish the plaintiff with a proof of loss form although there were some in Mutual's office. Furthermore, Catchings at no time informed Hood of any requirement concerning the way in which his loss should be evidenced or designated when ascertained.

Approximately two or three weeks subsequent to April 13, Hood and some of his hired help rode horseback onto the Templeton place after the flood waters had receded, and plaintiff noticed some few dead cows thereon but did not count the number. With the help of his employees and Mr. Templeton's son, Hood drove his cattle back onto his place from the adjoining property of Mr. Templeton, which was completely enclosed with barbed wire fencing, none of which had been cut or washed away, with the exception of the one place which plaintiff had cut in order to permit the cattle access thereto. Plaintiff's cows were easily identifiable with a brand "H" as well as tags in their ears. Mr. Templeton had only 20 cows, all of which were accounted for after the flood. After herding his cattle back onto his land, Hood repaired or replaced the cut fence. None of the other fencing around plaintiff's land had been damaged or cut with the exception of some located near Bayou Pierre, and plaintiff and his hired hands conducted a search in the general area but have never been able to find or recover more than 46 of the mixed-breed cows and 2 bulls. The fair market value of each of the cows at the time of the flooding was at least $275.00.

In January, 1974, the Bank of Hazelhurst had loaned the plaintiff $50,000.00 for his business operations and took as security for payment his Templeton place and the cattle located thereon. In order to ascertain the number of cattle located on the place, an inventory was taken by John M. Hall, then vice president of the bank, after the cattle had been "gotten up" and put in a catch pen thereon. This inventory revealed 107 head of mixed breed cattle and 3 bulls, and none were lost or removed prior to the flood of April 13. Approximately two or three weeks subsequent to the flood Hood notified Hall that he had had "a severe loss of cattle" on the Templeton place as a result of the flood, and Hall informed him to let him know when he "got the cattle up" so that he could inventory them to determine the number lost, which the plaintiff did on August 24 or 25, 1974. Hall again inventoried the cattle in the catch pen which totaled 46 cows and 2 bulls, and is all of the cattle that Mr. Hood has been able to find or account for subsequent to the flood.

The plaintiff first reported his exact loss to Mr. Catchings on November 15, 1974 by written memorandum (Ex. G–11) and on this same date, Mutual, through Catchings, first reported the loss to Fireman's Fund through a "property loss notice" (Ex. G–12) which was received by Fireman's Fund at its New Orleans Claims Office on November 21. Several days thereafter, Gerald J. Leddy, claims representative of the insurer, requested a copy of the policy from its New Orleans office and then called to make an appointment with the plaintiff to accompany him to the Templeton place to inspect the loss, informing the plaintiff that he wished to see the carcasses of the dead cows. On December 13, 1974, Leddy and Hood drove over or cruised the Templeton place in Hood's four-wheel drive vehicle and drove for approximately one or two hours, getting out of the vehicle very few times, if any, finding and photographing the bones of three dead cows on some of the highest places. Only two of the piles of bones had skulls. After returning to his offices, Leddy wrote to Hood on December 19, 1974

thanking him for his cooperation and efforts to further prove his claim and attached Fireman's Fund draft payable to Hood and the Bank of Hazelhurst in the amount of $750.00 representing "payment for three head of cattle based on the several skeletons of the animals which we were able to locate." In this letter, Leddy stated his refusal to pay more than the above amount because of the "mysterious disappearance" exclusion in the policy, inasmuch as plaintiff's proof was based on "a pure inventory method" and could not "be relied upon for purposes of proving your claim. . . ." (Ex. G–2). In the last paragraph of this letter Leddy stated, "Due to the late reporting of this matter and the consequential inability to locate more of the drowned animals, I feel that this payment is reasonable and should represent a final settlement of this claim." Fireman's Fund objects to the Court considering this letter on the basis that it is an offer of compromise; however, we do not view it in that light but instead find that the word "settlement" means disposition or finalization of the claim, inasmuch as Leddy did tender a check for $750.00 representing payment for the three head of cattle but refused to pay for more inasmuch as he required the plaintiff to produce or exhibit the carcasses of all the dead animals, which is certainly apparent from his testimony that he would not pay and would not have paid on behalf of Fireman's Fund any amount for any cow reportedly lost in the flood until and unless its carcass was shown to him by the plaintiff, who contended that practically all of his cows that were lost in the flood were swept downstream by the swift and powerful current of the flooded bayou.

Leddy admitted, and the Court finds, that he made no further investigation of this reported loss. More specifically, he did not inquire of any neighbors or plaintiff's help concerning the flood, did not inspect any of the surrounding property in order to determine whether carcasses could be found, did not talk to any of the surrounding land owners or neighbors in order to ascertain whether they had any information concern-

ing plaintiff's missing cows. As a matter of fact, it was at this time that Hood told Leddy that Hall had made the two inventories on behalf of the bank in January and August, 1974; however, Leddy did not talk to Hall, but rather, asked the plaintiff to write him concerning the inventories, which Hall did on December 13, 1974 (Ex. G–6).

At no time did Leddy furnish plaintiff with a proof of loss form or inform him that such a form had to be executed and filed. All of Hood's business insurance was written by Mutual during the time in question and for a considerable period of time prior thereto, and practically all of it was with Fireman's Fund. All of the plaintiff's prior losses had been reported by him to Catchings in the same manner in which this loss was reported, and had in turn been communicated to Fireman's Fund by Mutual through Catchings in a similar manner as was done here. The defense of failing to give written notice and to file proof of loss within the time prescribed after its "discovery" was first raised by the insurance company in answer to this suit filed in the Chancery Court of Copiah County.

In resolving the issues in this diversity case, over which this Court has jurisdiction, Mississippi statutory and case law is determinative.

Mississippi Code Ann. (1972), § 83–17–1 provides in pertinent part that

Every person who solicits insurance on behalf of any insurance company, or who takes or transmits, other than for himself, an application for insurance or a policy of insurance, . . . or who shall receive or deliver a policy of insurance of any such company, . . . or receive, collect, or transmit any premium of insurance, . . . shall be held to be the agent of the company for which the act is done or the risk is taken as to all the duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract.

The Courts of this state have been liberal in determining who is the proper agent to receive notice, holding that an agency which delivered the policy and collected the premiums, and a local or district agent are all agents with authority to receive notice of a loss within the terms of the policy which provide for notice to the company or its agent, such as the policy in question in the case sub judice. *Fleming v. Travelers Ins. Co.*, 206 Miss. 284, 39 So.2d 885 (1949). *See also World Ins. Co. v. Bethea*, 230 Miss. 765, 93 So.2d 624, *appeal dismissed*, 355 U.S. 181, 78 S.Ct. 262, 2 L.Ed.2d 186 (1957); *St. Paul Fire & Marine Ins. Co. v. Loving*, 163 Miss. 114, 140 So. 727 (1932); Annot., 18 A.L.R.2d 443, 457 (1951). Therefore, Hood's verbal telephonic notice to Catchings of Mutual of the loss one week subsequent thereto constituted verbal notice to the defendant, Fireman's Fund, despite the fact that Mutual did not inform the insurer of this reported loss until November 15, 1974, when for the first time Mutual was apprised by Hood of the extent of his loss by written memorandum.

We turn now to the more difficult and vexing question of whether the policy in question required and the insured to give *written* notice of the loss which gave rise to a claim as soon as practicable and also to file with the company or its agent a detailed "sworn proof of loss within ninety days of discovery of the loss".

The author of a very comprehensive Comment, *Insurance Notice Clauses in Mississippi*, 44 Miss.L.J. 947, 953 (1973), makes an observation with which this Court agrees:

Mississippi's liberal interpretation of the requirements as to the form of notice is the preferred approach since the purpose of the notice clause is merely to place the insurer on notice of an occurrence, rather than to require the insured to make a full investigation of the occurrence himself. The primary concern of the courts should be whether notice was in fact given by the insured, and not how it was given. An insured, not represented by counsel immediately after an accident, and few are, normally does not know the proper method of giving notice

so that all necessary particulars are included. His normal reaction is to merely contact his insurance agent and explain to him what happened. This should be sufficient to enable the insurance company to make a proper investigation to determine whether the occurrence would be covered by the policy. The courts should determine whether notice was in fact given, but they should not be so strict as to disallow the notice because of a mere technicality in form.

The Mississippi Supreme Court has held that where a policy requires, as a condition precedent to liability or to the filing of a suit, that a written notice be given or a written proof of loss be filed within a particular time, Courts are bound to enforce the condition as written, in the absence of a waiver. Cases which so hold are *Pacific Ins. Co. v. Lovern*, 253 Miss. 804, 180 So.2d 290 (1965) and *Coahoma County Bank & Trust Co. v. Feinberg*, 241 Miss. 381, 128 So.2d 562 (1961). In *Feinberg* the Chancery Court dismissed a bill of complaint because of the failure of the insured to comply with the proof of loss provision of the policy which prohibited a suit against the company unless, as a condition precedent thereto, there had been full compliance with all of the terms of the policy and until thirty days after a proof of loss was filed by the insured. In *Lovern*, although the provision of the policy in question there was not quoted in the Court's Opinion, this Court disagrees with Fireman's Fund's contention in its brief that the filing of the notice was not a condition precedent in that policy, because the Mississippi Supreme Court at four places in its Opinion was careful to point out that the giving of notice and the filing of proof of loss within sixty days after the loss were conditions precedent to the right to recover and concluded that it was "regrettable that the appellees failed to comply with the condition precedent to their right of recovery," which resulted in the Court's inability to award them any relief whatever under the circumstances. 180 So.2d at 290, 292, 293.

■ However, Fireman's Fund's reliance on the above two cases is misplaced inasmuch as there is no express or implied stipulation in the policy in question herein making notice a condition precedent to recovery and thus, under the minority view, which Mississippi has adopted, failure to comply with this requirement does not cause the insured to forfeit his right to recovery, but in order for the insurer to be relieved of liability, it must have suffered prejudice thereby. *Hartford Accident & Indem. Co. v. Hattiesburg Hardware Stores, Inc.*, 49 So.2d 813 (Miss.1951); *Employers' Liab. Assurance Corp. v. Jones County Lumber Co.*, 111 Miss. 759, 72 So. 152 (1916); 44 Miss.L.J. 962 *et seq.*

The policy in *Hartford v. Hattiesburg Hardware Stores, supra*, required that "the insured shall, at the earliest practicable moment and in all events not later than fifteen (15) days after discovery of any fraudulent or dishonest act on the part of any employee by the insured, . . . notify the underwriter thereof by telegram or registered letter addressed and sent to it at its home office . . ., and within four (4) months after such discovery shall file with the underwriter affirmative proof of loss, itemized and duly sworn to. . . ." The Mississippi Supreme Court pointed out that although the policy contained the foregoing requirements, it did not provide that the failure to give notice or file proof of loss shall relieve the insurer from liability, nor did it, by necessary implication, make the notice provision the essence of the contract. Consequently, the Court held that failure of the insured to give the notice within the required period of time could not be availed of by the insurer unless it was made to appear that the failure to do so resulted in such prejudice to its rights as would make it inequitable to permit a recovery thereon, and that such was not the case. The Court further stated the following:

In the *Employer's Liability Assurance Corporation* case, supra [111 Miss. 759, 72 So. 152], this Court quoted with approval the following extract from the opinion of

the Arkansas Supreme Court in *Hope Spoke Co. v. Maryland Casualty Co.*, 102 Ark. 1, 143 S.W. 85, 38 L.R.A.,N.S., 62, Ann.Cas.1914A, 268:

" 'The following authorities fully sustain the view that failure to give notice within a specified time, in accordance with the terms of the policy, does not operate as a forfeiture of the right to recover, unless the policy in express terms or by necessary implication makes the giving of notice, within a time specified, a condition precedent to recovery: (Citations omitted). . . . In the absence of an express stipulation declaring this requirement to be of the essence of the contract, and therefore a condition precedent to the right of recovery, we do not think that it is correct to say that such a requirement is of the essence of the contract unless it is shown to materially affect the rights of the parties in the given case. We fail to see why it should be so in an insurance policy any more than in any other kind of contract, where strict compliance with every specification of the contract is generally held not to be of the essence of the contract, unless made so by the terms of the contract or by necessary implication. *Lenon v. Mutual Life Ins. Co.*, 80 Ark. 563, 98 S.W. 117, 8 L.R.A.,N.S., 193, 10 Ann.Cas. 467. The facts of this case illustrate the justness of the conclusion we reach on the question. Appellee received notice of the accident in time to make a full investigation and to investigate to its satisfaction. It is not claimed that it suffered any loss or injury by reason of not having received the notice earlier. The defense is purely technical and without any substantial merit.'

"The doctrine thus announced appeals to reason and a proper sense of justice and is approved by us."

For the reasons stated above we think that the failure of the appellees to give notice to the appellant of the alleged fraudulent and dishonest acts of the employee Barnette within 15 days after the employee Roy Finnegan reported to E. C. Simmons the 3,720 gallon shortage at the Carson plant on December 20, 1947, or to file with the appellant an itemized statement or proof of loss within four months from that date, cannot be interposed as a defense to the present action. 49 So.2d at 819–820.

The prejudice rule avoids the inequities of a strict interpretation of a notice clause by considering prejudice and places the burden of showing prejudice upon the insurer rather than the insured, although theoretically the insured still has the burden of complying with all conditions precedent to liability.

The Mississippi rule was discussed and applied by the United States Court of Appeals for the Fifth Circuit in *Young v. Travelers Ins. Co.*, 119 F.2d 877 (5th Cir. 1941). In recognizing the fact that Mississippi is geared to the "prejudice rule" the Court in *Young* stated that the burden of proof is on the insurer to prove that the delay in giving notice had prejudiced its investigation and that speculative or hypothetical prejudice was not the kind at which the law looked in construing the notice clause, but that actual prejudice must be shown in order to sustain the burden of proof. 119 F.2d at 880. The Fifth Circuit, in reversing the lower court which had rendered a declaratory judgment in favor of the insurance company, recognized that Mississippi decisions clearly established that the notice provision in question was not an absolute one to be given effect as upon an arbitrary time table, but is effective to release the insurer from the obligations of the policy only where it appears, taking both the time of the accident and the time of the notice into view, that the failure to give notice was unreasonable in itself, or if not unreasonable in itself, was so unreasonable that the insurer had been prejudiced from the delay. 119 F.2d at 880.

Since the policy in the case sub judice does not expressly or impliedly make the giving of written notice and filing of proof of loss within ninety days conditions to suit or recovery, the plaintiff's failure to comply

therewith did not constitute a forfeiture of his right to recover in the absence of adequate proof by Fireman's Fund that non-compliance had prejudiced it, thus making it inequitable to permit recovery. *Hartford Accident & Indem. Co. v. Hattiesburg Hardware Stores, Inc., supra; Fidelity & Deposit Co. v. Merchants' & Marine Bank,* 169 Miss. 755, 151 So. 373 (1933), *modified,* 169 Miss. 755, 154 So. 260 (1934); *Employers' Liab. Assurance Corp. v. Jones County Lumber Co., supra.*

The Courts of Mississippi have been liberal in their application of the prejudice rule, have construed the notice and proof of loss requirements of a policy strongly in favor of the insured, have required the insurer to prove "actual" prejudice from the insured's failure to comply with such requirements, and have been reluctant to find prejudice in the absence of overwhelming evidence of harm to the insurer. *Young v. Travelers Ins. Co., supra;* 44 Miss.L.J. at 969.

With the foregoing principles in mind, it is now necessary to determine from the facts of this case whether the insurer has met its burden of proving actual prejudice by the insured's non-compliance with the written notice and proof of loss requirements, since the question of harm or prejudice must be determined from the facts and circumstances of each particular case.

As previously stated, the plaintiff notified his brother-in-law, Catchings, approximately one week subsequent to the flood, that he had probably sustained a loss of cattle by drowning. At this time Mr. Hood had not received the policy in question, which was not delivered to him until approximately the middle or last part of May. At this time, Catchings admitted that he knew the policy would require the plaintiff to give him written notice thereof but he did not inform him of this requirement, request any written notification, or advise him of the requirement that proof of loss be filed. Catchings' only response was a request that plaintiff "get him a number" of the cattle which were drowned as soon as this fact could be ascertained. At no time

did Catchings inform the plaintiff that he was required to count the number of carcasses or locate them on his land, and certainly, the policy did not require proof of loss in this manner, as will be more fully discussed herein. Catchings stated that the reason that he did not require plaintiff to file a written notice is because he had usually handled claims against Fireman's Fund, made through Mutual, in the same manner, including claims previously made by the plaintiff, without any difficulty or protest by the insurer. Also, the reason that he did not furnish the plaintiff with a proof of loss form, which was available in Mutual's office, or inform him of the requirement that it be filed, was because these type claims had been honored by Fireman's Fund in the past through telephonic communication or notification of loss by Mutual, as was also admitted by the insurer's claims representative, Gerald Leddy. It is undisputed that Catchings did not inform Fireman's Fund of this loss until his written notice of loss mailed on November 15 was received by the insurance company at its office on November 21. Catchings admitted that although he knew that the agency agreement required that he "immediately notify Fireman's Fund of all reported losses", he felt that it was not necessary to do so until he could ascertain the exact extent of the loss, despite the fact that he acknowledged that he had sufficient information from the verbal claim made by the plaintiff to apprise Fireman's Fund thereof. He further testified that he would give immediate notice to the insurer "if he had to do it over again".

When the water finally receded from the Templeton place approximately one week subsequent to April 13, Hood went back on it and noticed very few dead cows. It is his contention, which seems reasonable and likely, that most of them had been swept away by the turbulent current of the flood waters from Bayou Pierre, having actually seen some of his cows in the creek on his land on April 13 when he swam thereon and cut the fence to the S. E. Templeton place.

Cecil Templeton, son of S. E., rode his motor bike over approximately 60 acres of

the plaintiff's land a few days after the flood water receded and observed only three dead cows thereon on high places. The severity of the flood and the swiftness of the current of the Bayou is evidenced by the fact that it washed away a bridge which had been built in 1917, covered 99% of the plaintiff's land and resulted in the loss of six head of cattle of John Hall, the Vice-President of the Bank of Hazelhurst, who owned some property a distance from the plaintiff's. The flooding was so extensive that it resulted in the area in question being declared a federal disaster area.

Although the plaintiff normally inventories his cattle in May and September of each year, in 1974, the only two inventories were made by Hall for the Bank in January and in August, which revealed that 61 head of cattle were missing. (Although the plaintiff's written memorandum on November 15, 1974, which was his first written report to Mutual of the number of cattle lost, stated it as 51, this was an error in subtraction based upon the before and after inventories.)

Hood was unable to explain why he failed to notify Mutual of the number of cattle lost in the flood between the August inventory and November 15, except to state that he was very busy and shorthanded and thought his insurance coverage was good and valid, particularly in view of the fact that no one connected with Mutual requested that he get this information to them by a certain date, complained or requested the information in the interim.

The plaintiff's telephonic notification to Catchings of Mutual constituted notice to the defendant insurance company under the law of Mississippi. When Leddy received the written notice of loss from Catchings on November 21, he arranged to make an inspection of the plaintiff's land which was carried out on December 9, 1974. Leddy's investigation of this claim was, to say the least, cursory in nature, inasmuch as he rode over the land with Hood for approximately one or two hours. Although the plaintiff told him that most of his missing cattle were drowned and probably washed away by the flood waters, he made no inquiry of neighbors, including Mr. Templeton and his son; he conducted no investigation of the surrounding area in spite of the fact that it was obvious to him that there had been severe flooding; and he did not even contact Mr. Hall at the Hazelhurst Bank in spite of the fact that Hood informed him that Hall was the one who made the before and after inventories, but rather asked plaintiff to have Hall write him to confirm what the plaintiff had told him, which Hall did by a subsequent letter. Leddy admitted that he would have conducted this same type investigation if he had been notified of the loss immediately thereafter and that he would have paid on behalf of Fireman's Fund only for carcasses of cows which were actually found, despite the fact that he had been informed of and found evidence of the flooding and been told of the tremendously strong current of the Bayou in connection therewith and that plaintiff had seen some of his cows in the creek during the flood. Leddy later offered to pay for and sent a check for $750.00 to cover the loss of three cows inasmuch as he had found only three carcasses or piles of bones on the Templeton place, and he testified that he would not, under any circumstances, have accepted a proof of loss by the inventory method regardless of when the inventories were made or by whom. He refused payment for the loss of any more than three cows based on the "mysterious disappearance" exclusion of the policy, which on cross examination, he admitted constituted an exclusion only in the "theft", and not the "death by drowning" provision.

Leddy did not furnish the plaintiff with a proof of loss form or ask that he execute one and he testified that he would not have done so even if he had conducted an investigation of this loss immediately thereafter and found no more dead cows or carcasses than he did during his December investigation, inasmuch as he would not have accepted any proof of loss by the inventory method and would not have paid on behalf of Fireman's Fund for the loss of any cows the

bodies, carcasses or bones of which he could not find.

Based upon all the foregoing evidence, this Court finds as a matter of fact and a matter of law that plaintiff did not unreasonably delay the giving of notice of his loss to Fireman's Fund through its authorized agent, and that the insurer has not met its burden of proving that it suffered actual prejudice because of the failure of plaintiff to give written notice of his loss prior to the time that he did or file a sworn proof of loss within ninety days after the discovery of his loss. Thus, it is not inequitable to permit plaintiff to recover against the defendant under the policy, but on the contrary, under the facts of this case, it would be inequitable to permit the defendant to avail itself of this defense to excuse it from paying plaintiff for the loss of his cattle which he has proved by a preponderance of the evidence to have resulted from the risk insured under the policy.

■ The Mississippi Supreme Court has held that a plaintiff is not bound to prove a loss beyond a reasonable doubt but that it is sufficient to warrant a recovery if he shows by a fair preponderance of the evidence that the loss was brought about by a risk insured against. Circumstantial evidence from which the trier of fact might reasonably infer the facts of the death of the cattle and the accident being its proximate cause is sufficient for this purpose. *Providence Washington Ins. Co. v. Weaver*, 242 Miss. 141, 133 So.2d 635 (1961). The Court has accepted the inventory method of proving a loss of personal property. See *Phenix Ins. Co. v. Dorsey*, 102 Miss. 81, 58 So. 778 (1912). A list of goods together with their values made by the insured himself and treated as an inventory and presented and introduced at trial, complied with all of the requirements of an inventory and was sufficient to constitute an itemized inventory of the stock on hand. *Penix v. American Cent. Ins. Co.*, 106 Miss. 145, 63 So. 346 (1913). Certainly the policy in question does not require the insured to produce the bodies, carcasses or bones of cattle follow-

ing a flood which, as here, is shown to be the cause of their drowning and death. It is unquestioned that the plaintiff's cows which exited his place through the cut fence onto S. E. Templeton's place could not have left Mr. Templeton's pasture land inasmuch as it was completely fenced and none of the fence was destroyed or cut by the flood. The plaintiff with his hired help rode on horseback approximately one week later and rounded up and drove back onto his land all of his branded and marked cattle that were found on Mr. Templeton's land, and a search was made of the surrounding areas but only 46 of the 107 cows were ever found. Certainly, the severity of the flood and the swiftness of the current in all probability accounted for the drowning of the cows and in all probability resulted in the inability to find more dead cows, carcasses or bones thereof which were apparently swept downstream. Any other conclusion would be completely unwarranted and unreasonable, and to require plaintiff to produce cows which died as a result of a severe flood of this type in order to recover for their insured loss under this policy would be unfair, inequitable and unwarranted. This Court thus concludes that the plaintiff has through circumstantial evidence proved by a preponderance of the evidence that he lost 61 insured cows as a direct and proximate result of death due to drowning in the flood which occurred on April 13, 1974. This was a risk insured against by the policy in question, for which the premium was paid, and plaintiff is entitled to recover from Fireman's Fund the insured amount of $250.00 per cow or a total amount of $15,250.00 together with his costs incurred herein.

In view of the Court's finding in favor of the plaintiff against the defendant Fireman's Fund, it is not necessary that we determine the question of liability of Catchings and Hartung, d/b/a Mutual Insurance Agency to the plaintiff.

However, it is necessary that this Court consider and decide the third party claim of Fireman's Fund against Mutual based on

Mutual's alleged violation of that provision of the agency agreement which required it to immediately notify Fireman's Fund of all claims for losses made to Mutual under policies written by it on behalf of the insurance carrier.

The pertinent provision of the agency contract (Ex. G–8) provides:

Agent shall immediately report all claims and losses and turn over all legal process involving coverages placed with Company to the nearest Company Claims Office or authorized representative.

As previously stated, it is undisputed that approximately one week subsequent to the flood, Carroll Hood orally advised Mutual through Catchings of the probable loss of cattle resulting from the flooding of Bayou Pierre, but that the first time that Mutual notified Fireman's Fund of this claim was by written notice of the loss mailed on November 15, 1974 and received by the insurer at its New Orleans office on November 21. Catchings testified that the reason he waited until November 15 to advise Fireman's Fund of Hood's claimed loss was because it was on that date that he first received from Hood information concerning the exact number of cattle for which the claim was made, which is in fact correct. It is Mutual's contention that it delayed notifying the insurer inasmuch as the latter would have required Mutual to obtain information concerning the exact number of cattle allegedly lost even if it had informed the Company earlier. However, Catchings admitted that he knew that the agency agreement required Mutual to report all claimed losses rather than completed or ascertained losses, and that Mutual had sufficient information one week after the flood to inform Fireman's Fund of the exact nature of the claim being made so that it could be investigated; furthermore, if he had it to do all over again he would

have notified the Company of the claim when he first learned thereof, and in the past he had normally advised Fireman's Fund by phone of claims made under its policies placed by Mutual.

The general rules relating to the duties and liabilities of an agent to its principal apply to an agent of an insurance company, such as Mutual, including the duty to exercise good faith and loyalty to the interests of the company, to disclose all material facts connected with matters in its charge, to obey instructions given to it, and to exercise care, skill and diligence in the transactions of the company. It is liable to the company, its principal, for any damages to the latter proved by it to have proximately resulted from the breach of any of the foregoing duties, including that requiring immediate reporting of all claims and losses made to it by its policy holders, as required by the above quoted provision of the agency agreement.

Although Mutual violated the foregoing requirement, subjecting it to liability to Fireman's Fund, nevertheless this Court finds that the third party plaintiff failed to prove by a preponderance of the evidence that it was prejudiced thereby or that it suffered any damages as a direct and proximate result thereof, including its requirement to pay to Carroll Hood the loss which it had insured against in the policy and for which it collected a premium. Therefore, the third party plaintiff, Fireman's Fund, is not entitled to recover anything from the third party defendants, Catchings and Hartung, d/b/a Mutual Insurance Agency, and the Third Party Complaint shall be dismissed at the cost of the third party plaintiff.

A Judgment conforming with the above Findings of Fact and Conclusions of Law, approved as to form by counsel for all parties, shall be presented to this Court within the time provided by the local Rules.