443 So.2d 861 (1983)
FIRST NATIONAL BANK OF VICKSBURG, Vicksburg, Ms and D.W. Ellis, Trustee,
v.
Michael B. CARUTHERS and Rebecca R. Caruthers.
No. 53801.
Supreme Court of Mississippi.
December 14, 1983.
Rehearing Denied January 25, 1984.
*862 David W. Ellis, A.J. (Buddy) Dees, Jr., Ellis, Braddock & Bost, Vicksburg, for appellant.
Wren C. Way, Way & Field, Vicksburg, for appellees.
John Land McDavid, Richard M. Edmonson, McDavid, Edmonson & Noblin, E.L. Brunini, Sr., Walter S. Weems, Brunini, Grantham, Grower & Hewes, Jackson, for amicus curiae.
Before WALKER, P.J., and BOWLING and PRATHER, JJ.
WALKER, Presiding Justice, for the Court.
This is an appeal from the Chancery Court of Warren County wherein the court permanently enjoined the appellant, First National Bank of Vicksburg and D.W. Ellis (hereinafter the Bank), from exercising the power of sale as contained within a deed of trust securing certain property owned by the appellee. Aggrieved with this decision, the appellants have perfected their appeal to this Court. We reverse.
This case involves the enforceability of what the parties characterize as a "due-on-sale" clause contained within a deed of trust executed by the original mortgagors, Mr. and Mrs. Peoples, to First National Bank of Vicksburg. The original owners and mortgagors sold the secured property to a second purchaser, Mr. and Mrs. Wilcox, who, with the Bank's permission, assumed the balance due on the original indebtedness secured by the promissory note and deed of trust in question. Thereafter, Mr. and Mrs. Wilcox sold the subject property to the appellees, the Caruthers, who attempted to assume the outstanding indebtedness under the original promissory note and deed of trust. The Caruthers had full knowledge that the deed of trust contained the following provision, which they now challenge, as being unenforceable:
14. The indebtedness secured hereby may not be assumed, nor may the property described herein be sold or conveyed in whole or in part, without Beneficiary's prior written consent, and a breach of either of said conditions shall, at Beneficiary's option, cause the entire indebtedness secured hereby to become due and payable.
At the outset we emphasize the relationship of the parties to one another. The Caruthers were not a party to the original transaction between the Bank and the original mortgagors and the original mortgagors made no complaint about the contract entered into between themselves and the Bank. It is the Caruthers' contention that enforcement of the due-on-sale clause is contrary to public policy, and that it can only be enforced to protect a legitimate security interest of the Bank in the property. They further contend that enforcement by the Bank of the provision for the purpose of increasing the interest rate and thereby increasing the Bank's yield on its loan portfolio is not the type of interest that may be protected by the clause.
A majority of the states, approximately 22, now hold that this type of provision is enforceable as a valid and binding contractual provision voluntarily entered into by the original parties to the contract (deed of trust).
The propriety of upholding similar clauses is summed up in Dunham v. Ware Savings Bank, 384 Mass. 63, 423 N.E.2d 998 (1981) where it is stated:
At the outset, we note that the historic purpose of the due-on-sale clause was to protect the lender's security interest (Holiday Acres No. 3 v. Midwest Fed. Sav. & Loan Ass'n, 308 N.W.2d 471, 480 [Minn. 1981]), but with the advent of inflationary increases in the cost of borrowing money the clause has been used to protect the lender against other risks involved in the long-term loans associated with home finance. "The interest rate fluctuation is evidently a, indeed the, principal underlying characteristic of home lending activities which leads lenders to insist on due-on-sale clauses" (emphasis in original). Williams v. First Fed. Sav. & Loan Ass'n, supra [651 F.2d 910] at 927. Also it is important to note *863 that although mortgage loans are generally written for terms of twenty-five to thirty-five years, the average homeowner does not remain in one residence until his mortgage is repaid. In fact, figures submitted by amici curiae tend to establish that mortgages originating in the 1960's remained outstanding on the average from 6.5 to 9.8 years, depending on the year of origination. In 1980 the Federal National Mortgage Association bought thirty year mortgages at a yield based on a payoff within a twelve year period.
Whatever the precise numbers, it is clear that lenders negotiate home loans with the realistic expectation that they will not be held to maturity, and interest rates are adjusted accordingly. The device used to activate the "early" (actually anticipated) payoff before maturity is the due-on-sale clause, which reduces interest rate risk by reducing the average time over which a mortgage loan is outstanding. Invalidating the due-on-sale clause would in effect extend the life of the average mortgage loan perhaps two or three times longer than the lender had originally anticipated, intensifying the lender's risk of interest rate loss. It is fair to conclude that because of the reduced risk, use of an acceleration device lowers the interest rate at which the bank is willing to loan money. Viewed from this perspective, it can be argued that the mortgagors have already had the benefit of the clause which they now seek to invalidate.
Within the above context we turn to the policies which, on balance, make the clause reasonable and thus enforceable. They are: (1) the clause represents an equitable adjustment of rights between borrower and lender, (2) it may prevent State-chartered banks from operating at a competitive disadvantage with federally-chartered banks, and (3) it is a substantial benefit to the bank's depositors and to the future borrowers from the bank.
423 N.E.2d at 1001-1002.
In the present economic circumstances, the visibility of large institutional lenders often makes such institutions the focal point for community concern. The right of the lender to accelerate a mortgage debt in order to renegotiate the loan at market interest rates will only be utilized by lenders when interest rates have risen. However, this coincidence should not obscure the fact that inflation has many causes, and the right to enforce a due-on-sale clause no more causes rising interest rates than the exercise of a borrower's right to prepay his loan causes declining interest rates, or the carrying of an umbrella causes inclement weather. Both the right to prepay and the right to accelerate upon sale are protective devices relied upon by the community to moderate gains and losses in an uncertain economy. Because the due-on-sale clause is counterbalanced by the borrower's statutory right to prepay; because federally chartered institutions might continue to enforce it as a matter of Federal regulation irrespective of State court holdings; and because the clause offers substantial benefits to depositors and future borrowers, we conclude that if the clause does restrain alienation it does not do so unreasonably.
Id. at 1005.
Several jurisdictions, approximately 6, prohibit the enforcement of due-on-sale clauses, especially when used as a means to increase the rate of interest.
The confusion resulting from the lack of uniformity among the states has prompted the Federal government, through the Congress, to preempt state due-on-sale restrictions and, with certain exceptions which are not present in this case, to declare such provisions enforceable according to the language of the contract. In its legislative history, the Congress noted that for lenders the due-on-sale restrictions extend the lives of older low-interest mortgages, preventing the lender from increasing the yields on those loans at the time the property is transferred. A recent study done by the Federal Home Loan Bank Board concluded that the imposition of such restrictions nationwide would create within a *864 two-year period annual losses of $600 to $800 million for Federal savings and loans and $1 to $1.3 billion for all Federal and State savings and loan associations.
The committee stated that for the borrowers, the due-on-sale restrictions provided an advantage for the existing home buyers at the expense of new home buyers. It noted that new home buyers pay for due-on-sale restrictions in one of two ways: either they pay an inflated price for an existing home with a lower interest rate assumable loan; or they pay a premium for a new loan for a new home, or an existing home without an assumable loan. In the first case, the home sellers inflate the price of a home with an assumable loan to recover losses which result when they take back a second mortgage at a lower market interest rate; or the price increases to reflect the value of the assumable loan. In the second case, the lenders charge a premium for new loans in states which restrict due-on-sale clauses because the earnings from the new loan must offset older loans and originating an assumable loan rather than a loan with an enforceable due-on-sale clause posed a greater risk to the lender requiring a higher price for the mortgage. The committee also noted that these restrictions adversely affect secondary mortgage markets which rely on uniform homogeneous mortgage documents to efficiently operate and provide mortgage money for lenders and home buyers. It also pointed out that the United States Supreme Court upheld the right of federal savings and loan associations to enforce due-on-sale clauses[1] and that this significantly disadvantaged state chartered and other lenders and created uncertainty among the home buyers and sellers regarding the enforcement of the due-on-sale. In its preemption of state due-on-sale restrictions, the Congress placed all lenders on a more competitive footing and eliminated the confusion which surrounded the enforceability of due-on-sale.
This Act, enacted October 1, 1982, as Public Law 97-320, which has been entitled the Garn-St. Germain Depository Institutions Act of 1982 also provides for a "window period"[2] under section 341(c)(1) for a period of three years permitting restrictions on enforcement of the clause where there has been state action, either by judicial decision, legislation or constitutional amendments which restrict the enforcement of the due-on-sale clause. Mississippi has not placed restrictions on the use of the clause by constitutional or legislative action.
The appellees rely on the case of Sanders v. Hicks, 317 So.2d 61 (Miss. 1975) in support of their contention that the clause is unenforceable and that they came within the "window period" of the Garn-St. Germain Act.
We have carefully considered the opinion in Sanders v. Hicks, and have reached the conclusion that the case was erroneously decided. Therefore, insofar as Sanders holds that the clause in the deed of trust which prohibited the fee owner from selling the real property without the written consent of the mortgagee was invalid and unenforceable and is hereby overruled. The right of persons to contract is fundamental to our jurisprudence and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties.[3]Weatherford v. Martin, 418 So.2d 777 (Miss. 1982); United States Fidelity & Guaranty Co. v. Gough, 289 *865 So.2d 925 (Miss. 1974); Citizens National Bank of Meridian v. L.L. Glascock, Inc., 243 So.2d 67 (Miss. 1971); Travelers Indemnity Co. v. Chappell, 246 So.2d 498 (Miss. 1971); Employers Mutual Casualty Co. v. Nosser, 250 Miss. 542, 164 So.2d 426 (1964); Phenix Ins. Co. v. Dorsey, 102 Miss. 81, 58 So. 778 (1912).
The contract in question was entered into by the Bank and Mr. and Mrs. Peoples, the original mortgagors, who were satisfied with its terms, and we are not constrained to permit the Caruthers to invalidate and nullify that provision in their attempt to assume an undue advantage not enjoyed by other mortgagors by enjoying a much more favorable interest rate than that prevailing in the market when they purchased the property. When they purchased this property, they were fully aware of the due-on-sale provision as they had been advised of it by their attorney and by their real estate agent, and are now in no position to complain.
The remaining contentions of appellees are without merit.
The judgment of the Chancery Court of Warren County enjoining the Bank from foreclosing its deed of trust is dissolved and this cause is rendered here.
Our holding today overruling Sanders v. Hicks is prospective only except as it applies to this case.
JUDGMENT ENJOINING THE BANK FROM FORECLOSING ITS DEED OF TRUST IS DISSOLVED AND THIS CAUSE IS RENDERED HERE.
PATTERSON, C.J., BROOM, P.J., and ROY NOBLE LEE, PRATHER and ROBERTSON, JJ., concur.
BOWLING, HAWKINS and DAN M. LEE, JJ., dissent.

APPENDIX "A"

PART C  PREEMPTION OF DUE ON SALE PROHIBITIONS

DUE-ON SALE CLAUSES
SEC. 341.(a) For the purpose of this section 
(1) the term "due-on-sale clause" means a contract provision which authorizes a lender, at its option, to declare due and payable sums secured by the lender's security instrument if all or any part of the property, or an interest therein, securing the real property loan is sold or transferred without the lender's prior written consent;
(2) the term "lender" means a person or government agency making a real property loan or any assignee or transferee, in whole or in part, of such a person or agency;
(3) the term "real property loan" means a loan, mortgage, advance, or credit sale secured by a lien on real property, the stock allocated to a dwelling unit in a cooperative housing corporation, or a residential manufactured home, whether real or personal property; and
(4) the term "residential manufactured home" means a manufactured home as defined in section 603(6) of the National Manufactured Home Construction and Safety Standards Act of 1974 which is used as a residence; and
(5) the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, American Samoa, and the Trust Territory of the Pacific Islands.
(b)(1) Notwithstanding any provision of the constitution or laws (including the judicial decisions) of any State to the contrary, a lender may, subject to subsection (c), enter into or enforce a contract containing a due-on-sale clause with respect to a real property loan.
(2) Except as otherwise provided in subsection (d), the exercise by the lender of its option pursuant to such a clause shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the lender and the borrower shall be fixed and governed by the contract.
(3) In the exercise of its option under a due-on-sale clause, a lender is encouraged *866 to permit an assumption of a real property loan at the existing contract rate or at a rate which is at or below the average between the contract and market rates, and nothing in this section shall be interpreted to prohibit any such assumption.
(c)(1) In the case of a contract involving a real property loan which was made or assumed, including a transfer of the liened property subject to the real property loan, during the period beginning on the date a State adopted a constitutional provision or statute prohibiting the exercise of due-on-sale clauses, or the date on which the highest court of such State has rendered a decision (or if the highest court has not so decided, the date on which the next highest appellate court has rendered a decision resulting in a final judgment if such decision applies State-wide) prohibiting such exercise, and ending on the date of enactment of this section, the provisions of subsection (b) shall apply only in the case of a transfer which occurs on or after the expiration of 3 years after the date of enactment of this Act, except that 
(A) a State, by a State law enacted by the State legislature prior to the close of such 3-year period, with respect to real property loans originated in the State by lenders other than national banks, Federal savings and loan associations, Federal savings banks, and Federal credit unions, may otherwise regulate such contracts, in which case subsection (b) shall apply only if such State law so provides; and
(B) the Comptroller of the Currency with respect to real property loans originated by national banks or the National Credit Union Administration Board with respect to real property loans originated by Federal credit unions may, by regulation prescribed prior to the close of such period, otherwise regulate such contracts, in which case subsection (b) shall apply only if such regulation so provides.
(2)(A) For any contract to which subsection (b) does not apply pursuant to this subsection, a lender may require any successor or transferee of the borrower to meet customary credit standards applied to loans secured by similar property, and the lender may declare the loan due and payable pursuant to the terms of the contract upon transfer to any successor or transferee of the borrower who fails to meet such customary credit standards.
(B) A lender may not exercise its option pursuant to a due-on-sale clause in the case of a transfer of a real property loan which is subject to this subsection where the transfer occurred prior to the date of enactment of this Act.
(C) This subsection does not apply to a loan which was originated by a Federal savings and loan association or Federal savings bank.
(d) A lender may not exercise its option pursuant to a due-on-sale clause upon 
(1) the creation of a lien or other encumbrance subordinate to the lender's security instrument which does not relate to a transfer of rights of occupancy in the property;
(2) the creation of a purchase money security interest for household appliances;
(3) a transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety;
(4) the granting of a leasehold interest of three years or less not containing an option to purchase;
(5) a transfer to a relative resulting from the death of a borrower;
(6) a transfer where the spouse or children of the borrower become an owner of the property;
(7) a transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the borrower becomes an owner of the property;
(8) a transfer into an inter vivos trust in which the borrower is and remains a beneficiary and which does not relate to a transfer of rights of occupancy in the property; or

*867 (9) any other transfer or disposition described in regulations prescribed by the Federal Home Loan Bank Board.
(e)(1) The Federal Home Loan Bank Board, in consultation with the Comptroller of the Currency and the National Credit Union Administration Board, is authorized to issue rules and regulations and to publish interpretations governing the implementation of this section.
(2) Notwithstanding the provisions of subsection (d), the rules and regulations prescribed under this section may permit a lender to exercise its option pursuant to a due-on-sale clause with respect to a real property loan and any related agreement pursuant to which a borrower obtains the right to receive future income.
(f) The Federal Home Loan Mortgage Corporation (hereinafter referred to as the "Corporation") shall not, prior to July 1, 1983, implement the change in its policy announced on July 2, 1982, with respect to enforcement of due-on-sale clauses in real property loans which are owned in whole or in part by the Corporation.
(g) Federal Home Loan Bank Board regulations restricting the use of a balloon payment shall not apply to a loan, mortgage, advance, or credit sale to which this section applies.
DAN M. LEE, Justice, dissenting.
I respectfully disagree with the majority's opinion in two areas. First, in my view, it is an incorrect analysis of the law. Second, I believe the majority is too willing to surrender the legitimate interest of state government in governing property rights within our state to the federal government.
The majority cites Fidelity Federal Savings and Loan Ass'n v. Reginald D. de la Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), wherein the U.S. Supreme Court held a regulation of the Homeowners' Loan Board had the effect of pre-empting a state statute. We should take advantage of the invitation extended the states in the Garn-St. Germain Act, passed by the United States Congress after the unfortunate decision in Fidelity Federal, supra, and allow our decision in Sanders v. Hicks, 317 So.2d 61 (Miss. 1975), to stand in order to provide time for our state legislature to enact statutes suggested by the Garn-St. Germain Act. The pertinent parts of the Garn-St. Germain Act read as follows:
(b)(1) Notwithstanding any provision of the constitution or laws (including the judicial decisions) of any State to the contrary, a lender may, subject to subsection (c) enter into or enforce a contract containing a due-on-sale clause with respect to a real property loan.
(2) Except as otherwise provided in subsection (d), the exercise by the lender of its option pursuant to such a clause shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the lender and the borrower shall be fixed and governed by the contract.
(3) In the exercise of its option under a due-on-sale clause, a lender is encouraged to permit an assumption of a real property loan at the existing contract rate or at a rate which is at or below the average between the contract and market rates, and nothing in this section shall be interpreted to prohibit any such assumption.

(c)(1) In the case of a contract involving a real property loan which was made or assumed, including a transfer of the liened property subject to the real property loan, during the period beginning on the date a State adopted a constitutional provision or statute prohibiting the exercise of due-on-sale clauses, or the date on which the highest court of such State has rendered a decision (or if the highest court has not so decided, the date on which the next highest appellate court has rendered a decision resulting in a final judgment if such decision applies state-wide) prohibiting such exercise, and ending on the date of enactment of this section, the provisions of subsection (b) shall apply only in the case of a transfer which occurs on or after the expiration *868 of 3 years after the date of enactment of this Act, except that 
(A) a State, by a State law enacted by the State legislature prior to the close of such 3-year period, with respect to real property loans, originated in the State by lenders other than national banks, Federal savings and loan associations, Federal savings banks, and Federal credit unions, may otherwise regulate such contracts, in which case subsection (b) shall apply only if such State law so provides; and
(B) the Comptroller of the Currency with respect to real property loans originated by national banks or the National Credit Union Administration Board with respect to real property loans originated by Federal credit unions may, by regulation prescribed prior to the close of such period, otherwise regulate such contracts, in which case subsection (b) shall apply only if such regulation so provides.
(2)(A) For any contract to which subsection (b) does not apply pursuant to this subsection, a lender may require any successor or transferee of the borrower to meet customary credit standards applied to loans secured by similar property, and the lender may declare the loan due and payable pursuant to the terms of the contract upon transfer to any successor or transferee of the borrower who fails to meet such customary credit standards.

(B) A lender may not exercise its option pursuant to a due-on-sale clause in the case of a transfer of a real property loan which is subject to this subsection where the transfer occurred prior to the date of enactment of this Act. [Emphasis added]
Through the Garn-St. Germain Act Congress has expressly provided a three year "window" in which the various states may enforce prohibitions against due-on-sale clauses. It also allows states three years' time within which to pass legislation to fill the vacuum and thereby prevent further federal encroachment on legitimate state interests. While the majority's opinion correctly recognizes that these prohibitions may be either in the form of "judicial decision, legislation or constitutional amendments;" that opinion fails to correctly address the decisions of this Court which do in fact place limitations on the enforceability of due-on-sale clauses.
The three year window period of the Garn-St. Germain Act has application to our state because of this Court's decision in Sanders v. Hicks, 317 So.2d 61 (Miss. 1975). In Sanders, this Court expressly held that a restraint on alienation such as a due-on-sale clause must have some relation to a threat to the legitimate interests of the mortgagee. The majority's opinion seems to indicate that economic profiteering is such a legitimate interest under Sanders, supra. I must disagree. In my opinion, it is only those threats which are capable of causing loss to an already existing interest of a mortgagee which were intended to be prevented by the holding in Sanders. The mere possibility of future loss by a financial institution because it cannot sell new mortgages at a higher interest rate is certainly not the type of threat contemplated by the Sanders decision. Again, in order to be a threat to the legitimate interests of a mortgagee, those interests must be in existence. In other words, a mortgagee would be within its rights in prohibiting the assumption of a mortgage by one obviously incapable of meeting the obligations of the mortgage. Such an assumption would be a threat to an existing interest. The inability to inflate interest rates previously negotiated and contracted for is no such threat.
I see no reason for this Court to make excuses for inflationary banking practices through the guise of preventing threats to legitimate interests. That is a matter of particular interest for the legislatures of this nation, whether Congress or the state legislatures. Because Congress has addressed this issue and provided the states with a three-year window period under the Garn-St. Germain Act, I feel we should abide by the wisdom of our decision in Sanders until that window is closed, locked and nailed shut.
*869 The past several years have seen a continued erosion by the federal government of the states' legitimate interest over matters which properly are best handled by the various states. Today's decision, an act of Super Legislation, does disservice to the homeowners and potential buyers of this state, by surrendering the three-year window period in which we are free to govern our state in this regard.
BOWLING and HAWKINS, JJ., join in this opinion.
NOTES
[1] See Fidelity Federal Savings & Loan Ass'n, et al. v. Reginald D. de la Cuesta, et al., 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).
[2] See Appendix "A" for relevant portions of the Act.
[3] It should go without saying, however, that provisions in contracts contrary to public policy [Smith v. Simon, 224 So.2d 565 (Miss. 1969); Jackson v. Sam Finley, Inc., 366 F.2d 148 (5th Cir.1966); Smith v. Maryland Cas. Co., 252 Miss. 81, 172 So.2d 574, 575 (1965)] or where obtained by overreaching [Bunch v. Shannon, 46 Miss. 525 (1872)] duress [Duckworth v. Allis-Chalmers Mfg. Co., 247 Miss. 198, 150 So.2d 163 (1963)] or undue influence [Wherry v. Latimer, 103 Miss. 524, 60 So. 563 (1913)] are unenforceable.