**WARRINGTON 611 ASSOCIATES, Plaintiff,**

v.

**AETNA LIFE INSURANCE CO., Defendant.**

**Civ. A. No. 87–2870.**

United States District Court, D. New Jersey.

Feb. 7, 1989.

**230**

Lawrence P. Platkin, Robinson, Wayne & La Sala, Newark, N.J., for plaintiff.

William J. O'Shaughnessy, Harvey C. Kaish, Clapp & Eisenberg, Newark, N.J., for defendant.

---

1. 28 U.S.C. § 1332(a).

2. The relevant provision reads as follows:
   Prepayment Privilege: No prepayments will be permitted until 11 years from the due date of the first payment to interest and principal as provided for above; thereafter, Applicant

## OPINION

WOLIN, District Judge.

This is a case involving a promissory note and a mortgage on commercial property. Plaintiff, the property owner, claims that defendant, the note holder and mortgagee, improperly refused its consent to plaintiff's sale of the property and that plaintiff suffered adverse tax consequences and other damages as a result thereof. Plaintiff seeks damages and relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. Jurisdiction is based on diversity of citizenship.[1]

The parties have filed cross-motions for summary judgment. The Court will grant defendant's motion.

## INTRODUCTION

The material facts in the case are not in dispute. Plaintiff Warrington 611 Associates ("Warrington") is a Pennsylvania limited partnership that owns a shopping center located at the corner of Routes 123 and 611 in Warrington, Pennsylvania. The general partners and principals of Warrington are Roger Whyman, a lawyer, and Joseph Flotteron, an architect and engineer. Aetna Life Insurance Co. ("Aetna") is the holder of a promissory note and a mortgage on the shopping center property.

On approximately March 8, 1976, Warrington applied to Aetna, on a standard Aetna form, for a mortgage loan in the amount of $2,400,000 to finance the shopping center project. The first page of the mortgage loan application contained a provision prohibiting prepayment of the loan within the first 11 years (*i.e.*, until 1988) and allowing prepayment thereafter only if Warrington paid a prepayment charge of 5% for prepayment in the twelfth year; this fee would be gradually reduced by 1% per year to a minimum charge of 1% for prepayment in subsequent years.[2] Aetna

reserves the privilege to make prepayments by paying a prepayment charge of 5% on the amount so prepaid with said prepayment charge being reduced after the 11th year at the rate of 1% annually thereafter to a minimum charge of 1%. Permitted prepayments

issued a permanent loan commitment on March 19, 1976, as amended on March 26, 1976. Warrington accepted the commitment as amended on April 5, 1976.

On or about June 18, 1976, Warrington executed a note to the Philadelphia National Bank, the construction lender on the Warrington project, in the principal sum of $2,400,000 plus interest at the annual rate of 9.75%. On that same date, Warrington, as mortgagor, executed a mortgage to the Philadelphia National Bank securing the note. Pursuant to a permanent loan buy/sell agreement between the Philadelphia National Bank and Aetna, and by an assignment executed on October 18, 1977, Aetna acquired and now holds the Note and is the current mortgagee on the Mortgage.

Paragraph 8 of the Note provides for the same prepayment restrictions specified in the mortgage loan application.[3] Paragraph 20 of the Mortgage, which the parties agree is a "due-on-sale" clause, prohibits Warrington, under penalty of default, from transferring title to the mortgaged property without the prior written consent of Aetna.[4] It is these two provisions of which Warrington complains.

In September of 1986, Whyman began negotiating with Realco, Inc., a New York corporation, over the sale of the shopping center property to Realco.[5] According to Whyman, he and Realco "firmed up [their] negotiations" for the sale of the Warrington property on December 14, 1986.[6] On December 17, 1986, Whyman telephoned Aetna to advise it that Warrington had reached an agreement to sell the mortgaged property and that the closing was to take place before December 31, 1986. According to Whyman, he requested that Aetna send him a "pay-off" letter so that he could sell the property.[7] Whyman avers that the Aetna representative with whom

can be made only on interest due dates, and after 60 days' prior written notice to Aetna.

3. Paragraph 8 of the Note provides:
   After the purchase of this Note by Permanent Lender, Maker shall have the right to prepay, on any installment payment date after the expiration of the eleventh loan year (as hereinafter defined) of the term hereof, the entire principal sum hereof, or part thereof; provided, however, that Maker is not then in default hereunder; that Maker shall have given Permanent Lender at least sixty (60) days' prior written notice by registered mail, return receipt requested, of Maker's intention to make such prepayment; and that any such prepayment is accompanied by payment of all interest accrued hereunder to the date of prepayment and by payment of a prepayment fee computed on the amount of such prepayment as follows:
   (a) Five percent (5%) if prepayment is made during the twelfth loan year;
   (b) Four percent (4%) if prepayment is made during the thirteenth loan year;
   (c) Three percent (3%) if prepayment is made during the fourteenth loan year;
   (d) Two percent (2%) if prepayment is made during the fifteenth loan year;
   (e) One percent (1%) if prepayment is made at any time after the fifteenth loan year.
   For purposes of this paragraph 8, the term 'loan year' shall mean any one year period ending on the anniversary of the date the first obligatory monthly installment of principal and interest becomes due pursuant to paragraph 5 above. Upon prepayment notice being given, the amount of the prepayment as set forth in Maker's notice of intent to prepay, accrued interest, prepayment fee and all other sums payable hereunder and under the Mortgage shall be due and payable on the installment date fixed by the notice, and collection thereof may be enforced by Permanent Lender according to the terms of this Note and the Mortgage.

4. Paragraph 20 of the Mortgage provides:
   Without the prior written consent of Mortgagee, Mortgagor will abstain from and will not cause or permit, to the extent it may do so, any transfer of title to the Mortgaged Property or any part thereof, voluntarily or by operation of law (other than by death or by execution on the Note or foreclosure under this Mortgage); or any issuance or transfer of stock in Mortgagor if Mortgagor is a corporation, or of interests in Mortgagor if Mortgagor is a partnership or joint venture, whether by sale, exchange, conveyance, merger, consolidation or otherwise. Any violation of the foregoing limitations, at the option of Mortgagee, shall be deemed an Event of Default hereunder.

5. Whyman also negotiated with Realco over the sale of two other shopping centers, each of which was owned by limited partnerships in which Whyman and Flotteron were the general partners. These negotiations fell through for reasons immaterial to the instant dispute.

6. Whyman Deposition, at 24.

7. *Id.* at 25–26.

he spoke[8] told him that she would send the pay-off letter out by overnight mail.[9] Aetna did not send any such letter.

Shortly after his conversation with the Aetna employee, Whyman telephoned Lattimer & Buck, Aetna's correspondent agent on the Warrington loan, and spoke with Martin Woodrow, the Lattimer & Buck employee responsible for the loan. In that conversation, Woodrow informed Whyman that it was Aetna's practice to require a fee as a condition of prepayment in cases in which prepayment was prohibited by the loan documents. Woodrow further informed Whyman that Warrington was "locked in" to the loan and would thus have to pay such a prepayment fee in order to be able to sell the mortgaged premises. Whyman responded with his view that such a fee only applied to a refinancing of the loan (when the mortgagor continued to hold the property) but was inapplicable and inappropriate in the case of a sale of the property.[10]

On December 22, 1986, Flotteron telephoned Woodrow to further discuss a prepayment of the loan.[11] According to Whyman, Woodrow informed Flotteron that "any requests that were going to be made to Aetna from us had to be in writing hereafter and had to go through [Woodrow]."[12] Warrington never submitted a request in writing to Aetna through Woodrow or otherwise.[13]

On December 23, 1986, the day after Flotteron's conversation with Woodrow, Whyman wrote a letter to Aetna memorializing his conversation with Woodrow and setting forth his opinion on the matter. The letter stated in part:

> I told Mr. Woodrow of, and asked him as your agent to convey to you, our position that it was illegal and improper for you to demand both a pre-payment penalty and a due-on-sale clause and that your position prevented and restrained our ability to sell our project. I also advised your agent that your prepayment clause was only intended to apply to us as borrower if we wanted to pre-pay the mortgage but remain as the owner of the project. However, you and your agent are attempting to apply the pre-payment penalty as a condition of your allowing us to sell our project and satisfy the lien of your mortgage on the sale.

The letter was received by Woodrow at Lattimer & Buck on December 24, 1986, but not by Aetna until January 6, 1987.

On December 30, 1986, representatives of Warrington and Realco met in New York City for a "pre-closing." The meeting continued into late evening. It is undisputed that a contract of sale was never executed. Warrington contends, however, that an agreement was reached for the sale of the premises. Aetna disputes this.

The property was not sold to Realco by the end of 1986 and has not been sold by Warrington since then. Because of the change in the federal tax laws as of the beginning of 1987, Warrington alleges that it sustained financial losses by its inability to sell the property to Realco by the end of 1986.

During the period in question, it was Aetna's policy to allow prepayment of notes even when the notes by their terms prohibited prepayment. As a condition of its consent, however, Aetna would require the borrower to compensate or "immunize" Aetna for the economic loss that it would sustain as a result of the prepayment. This compensation would be in the form of a "yield maintenance fee." An analyst at Aetna would compute this fee by determining the total prepayment amount that, when invested at the prevailing market

---

8. At his deposition Whyman could not recall the name of the woman at Aetna with whom he spoke that day; he could identify her only as a "lady in a mortgage department" at Aetna. *Id.* at 24–27.

9. *Id.* at 26. Aetna sharply disputes this allegation but assumes its veracity for purposes of the instant motion.

10. *Id.* at 37–39, 40–46.

11. Flotteron Deposition, at 73–74.

12. Whyman Deposition, at 57–58.

13. Kautter Deposition, at 49–50; Moegenburg Deposition, at 18, 60.

rate, would yield a return equivalent to the return that Aetna would receive if the loan ran the full term.[14]

Aetna had procedures for processing prepayment requests. The first step in the procedure was for the borrower to submit in writing its request for prepayment, along with a $500 processing fee. Aetna would also require certain information about the property, such as operating statements and a current rent roll. In addition, for prepayment in the context of a sale of the property, Aetna would require the borrower to submit an executed sales contract.[15] Warrington never complied with these procedures, apparently because of Whyman's view that a prepayment fee was inappropriate in the context of a sale. Even if Warrington had complied with the procedures, it probably would not have been able to obtain a pay-off letter from Aetna in time because Aetna had developed a policy in late November or early December that all requests for prepayment by the end of 1986 would have to be received by Aetna by December 15, 1986. Aetna developed this policy because of a deluge of such requests that it was receiving by borrowers who wanted to sell their property before the imminent change in the federal tax laws.[16]

## DISCUSSION

### I. Does a Prepayment Prohibition Unreasonably Restrain Alienation of Property?

■ Warrington alleges that the prepayment restriction in the loan documents is an impermissible restraint on alienation. Aetna contends, and Warrington does not dispute, that Pennsylvania law governs the transaction in question.[17] Under Pennsylvania law, the Court finds such prepayment restrictions to be valid in the commercial context.

The starting point in the analysis is to determine whether the prepayment restriction is a restraint on alienation at all. According to the Restatement, a condition imposing contractual liability on one who later conveys property in violation of the agreement is a "promissory" restraint on alienation. Restatement of Property § 404(1)(b) & (2) (1944). The Court agrees that the prepayment restriction in ¶ 8 of the Note is such a restraint. The next step in the inquiry is to determine whether this restraint is reasonable or unreasonable.

Initially, the question might be asked how a prepayment fee could possibly be reasonable: if the lender can collect the balance of the loan's principal sum and all interest due to date, and can presumably reinvest the funds elsewhere, then doesn't that give it the benefit of its bargain? The short answer is that receipt of the principal balance and accrued interest does not give the lender the benefit of its bargain. In contracting to lend its money, the lender has bargained for a particular rate of return over a specified period of years. If interest rates have declined since the loan transaction, then the lender will suffer a loss in reinvesting the funds at the currently lower rate for the duration of the original loan term. As one court has noted, "[t]here is an expense attached to loaning money on real property, and it is an entirely legitimate aim of purveyors of credit to loan it for a length of time and at a rate of interest which guarantees a certain net return on the management of money." *Hartford Life Insurance Co. v. Randall,* 283 Or. 297, 300–301, 583 P.2d 1126, 1127 (1978); *see also La Sala v. American Savings & Loan Ass'n,* 5 Cal.3d 864, 880 n. 17, 489 P.2d 1113, 1123 n. 17, 97 Cal.Rptr. 849, 859 n. 17 (1971). Beyond the loss of the bargained-for rate of return, prepayment can cause serious economic consequences, such as an increased tax burden and unexpected reinvestment costs; for those investors whose purpose in lending money was to ensure a stable annual income for a period of years, it can also cause a frustration of that purpose. *Arthur v. Burkich,*

---

**14.** Kautter Deposition, at 23, 37–39.

**15.** Moegenburg Deposition, at 58–59.

**16.** *Id.* at 18–21, 24–25.

**17.** Paragraph 25 of the Note contains a choice-of-law provision favoring Pennsylvania law.

131 A.D.2d 105, 107, 520 N.Y.S.2d 638, 639 (1987) (citing Alexander, *Mortgage Prepayment: The Trial of Common Sense,* 72 Cornell L.Rev. 288, 310–17 (1987)). A "yield maintenance fee" is the sum that, when invested at prevailing interest rates along with the unpaid balance of the loan and the accrued interest, will provide the lender—for the duration of the original term of the loan—with the rate of return for which it bargained. Although it may not solve all the problems that may be caused by prepayment, a yield maintenance fee at least relieves the lender of the loss of its expected rate of return for the duration of the loan term.

In *Mahoney v. Furches,* 503 Pa. 60, 468 A.2d 458 (Pa.1983), the Supreme Court of Pennsylvania addressed the validity of prepayment restrictions in light of the general common law policy against restraints on alienation. Even in commercial transactions, the *Mahoney* court held, a right to prepayment would be presumed where the mortgage was silent as to the existence of such a right. *Id.* at 65, 468 A.2d at 461.[18] This presumption, however,

> could be rebutted by showing a contrary intent mutually manifested by the parties. Such a presumption would not work a hardship on the mortgagee since, in virtually all instances, he is the drafter of the mortgage note and can thus include within the note a clause stating that the note is not subject to prepayment. This would put the mortgagor on notice that he will in all probability be restrained from selling the land for the duration of the term. If he signs the note containing such a provision, he will then be bound by it even though it may restrain his right to its sale or use.

*Id.* at 65–66, 468 A.2d at 461. In dicta, the *Mahoney* court went on to temper its holding by stating that

> consistent with the policy against restraints on alienation, even where the mortgage explicitly states there is no right to prepay the note, if the mortga-

gor can provide the mortgagee with the benefit of his bargain under the terms of the note, he will be allowed to have a release of his land following the substitution of security or other arrangement.

*Id.* at 66 n. 1, 468 A.2d at 461 n. 1.

In arguing that the restraint is unreasonable, Warrington relies in part on California case law that holds due-on-sale and due-on-encumbrance clauses, though not per se unreasonable, to be unreasonable where enforcement is unnecessary to protect the lender's security interest. *E.g., Tucker v. Lassen Savings and Loan Ass'n,* 12 Cal.3d 629, 635–36, 526 P.2d 1169, 1173–74, 116 Cal.Rptr. 633, 637–38 (1974) (holding as an unreasonable restraint on alienation the automatic enforcement of a due-on-sale clause where the borrower has entered into an installment land contract to sell the secured property); *La Sala v. American Savings & Loan Ass'n,* 5 Cal.3d 864, 880–81, 489 P.2d 1113, 1123–24, 97 Cal.Rptr. 849, 859–60 (1971) (holding the enforcement of a due-on-encumbrance clause to be an unreasonable restraint on alienation unless the borrower's conduct endangers the lender's security); *Coast Bank v. Minderhout,* 61 Cal.2d 311, 316–17, 392 P.2d 265, 268–69, 38 Cal. Rptr. 505, 508–09 (1964) (upholding a due-on-sale clause but only after a determination that it was reasonable).[19] This reliance is misplaced for two reasons. First, those cases have mostly found due-on-encumbrance clauses to be invalid, while finding due-on-sale clauses to be valid. In fact, the California Supreme Court has specifically stated that a due-on-sale clause generally does not unreasonably restrain alienation for the following reason: in the case of a sale, the borrower usually receives sufficient cash to pay off the obligation. *See La Sala,* 5 Cal.3d at 880 n. 17, 489 P.2d at 1123 n. 17, 97 Cal.Rptr. at 859 n. 17. This contrasts with the operation of a due-on-encumbrance clause, which often takes effect without the borrower's having the

---

18. *But see Arthur v. Burkich,* 131 A.D.2d 105, 107–08, 520 N.Y.S.2d 638, 639–40 (1987) (declining to adopt the *Mahoney* rule).

19. *See also Nichols v. Ann Arbor Federal Savings & Loan Ass'n,* 73 Mich.App. 163, 173, 250 N.W. 2d 804, 809 (1977).

means to discharge the obligation on the secured property. *See id.*

The second reason that Warrington's reliance on the California cases is misplaced is that those cases were decided prior to a 1982 Act of Congress that declared, in preemption of state law, that due-on-sale clauses are valid and enforceable. Garn–St. Germain Depository Institutions Act of 1982 ("Garn Act"), 12 U.S.C. § 1701j–3.

Of course, Warrington seeks only to analogize to the case law on due-on-sale clauses since at issue here is not a due-on-sale clause but a prepayment fee, or more precisely, a combination of the two. Warrington argues that such a combination, as applied here, creates an unreasonable restraint on alienation. In support of this position, Warrington cites a recent opinion of the Washington Supreme Court, *McCausland v. Bankers Life Insurance Co.*, 110 Wash.2d 716, 757 P.2d 941 (1988). The *McCausland* court held first that the Garn Act did not preempt state restrictions on prepayment fees (or any real estate loan provisions other than due-on-sale clauses). *Id.* at 721–22, 757 P.2d at 944 (citing G. Nelson & D. Whitman, Real Estate Finance Law § 5.24, at 336); 12 U.S.C. § 1701j–3(a)(1).[20] After noting the valid purpose behind prepayment fees and restrictions, *McCausland* went on to hold that a seven-year prepayment prohibition did not impose an unreasonable restraint on alienation, at least in a commercial context. 110 Wash.2d at 721–25, 757 P.2d at 944–46. The court reasoned that such a prohibition merely prevented the borrower from refinancing the property, and did not prevent him or her from selling. *Id.* at 725, 757 P.2d at 946. The court then concluded that even a combination of a due-on-sale clause and a clause prohibiting prepayment or providing for a prepayment fee is not an unreasonable restraint on alienation as long as the two clauses do not operate

simultaneously; otherwise it is an unreasonable restraint. *Id.* at 725–26, 757 P.2d at 946. The court stated:

> If a lender elects to accelerate the debt upon sale because interest rates have increased, the lender should not also be allowed to collect a prepayment fee. The function of the prepayment fee or prohibition is to protect lenders from borrower refinancing in times of falling interest rates and should not be used to penalize borrowers who refuse to accept lender's [sic] increased interest rates at resale in times of rising rates. It is only fair that the lender be prohibited from demanding prepayment fees upon acceleration of the debt since, in that instance, it is the lender who is insisting on prepayment.
>
> The two provisions, rather than working contemporaneously, are used as economic complements to one another. While the *due-on-sale clause* enables a lender to require early payment of lower than market interest rate loans, the *prepayment penalty* is used to discourage refinancing by the borrower when market interest rates fall below the rate on the borrower's existing loan. The two provisions, therefore, are used by lenders to achieve different goals. Both are at least arguably necessary to protect a lender's long term loan portfolio.

*Id.* at 726–27, 757 P.2d at 946 (emphasis in original) (footnotes omitted).

In the case at bar, the two clauses arguably operated simultaneously in violation of *McCausland.* Importantly, however, *McCausland* is not controlling here. Rather, as noted, Pennsylvania law applies. There is nothing in the Pennsylvania Supreme Court's opinion in *Mahoney* that prohibits the simultaneous operation of a due-on-sale clause and a prepayment-fee clause. To the contrary, the above discussion of *Mahoney* indicates that such a dual

---

**20.** The *McCausland* court based its finding of nonpreemption on *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982), in which the Supreme Court held that where Congress has not totally displaced state regulation of a specific area or field, state regulation is permissible as long as such regulation would

not frustrate congressional purposes. *See* 110 Wash.2d at 722 & n. 8, 757 P.2d at 944 & n. 8. Since Aetna has not argued that the Garn Act preempts state law allowing prepayment fees or prohibitions, the Court will assume, without deciding, that there is no such preemption problem.

operation would be reasonable in a commercial context under Pennsylvania law as long as the borrower is not actually enjoined from selling the property.[21] Thus prepayment is permissible even in the face of a nonprepayment clause as long as the borrower pays the appropriate yield maintenance fee.

The *Mahoney* case refutes the position taken by Whyman that a prepayment fee is inappropriate in the context of a *sale* of the property. As the *Mahoney* court stated (in the portion of the opinion quoted at length above), a contractual clause prohibiting prepayment of a commercial loan secured by a mortgage puts the borrower on notice that he will "be restrained from *selling* the land" and that his signing of a note containing such a provision will "restrain his right to its *sale* or use." 503 Pa. at 65–66, 468 A.2d at 461 (emphasis added). The *Mahoney* dicta implies that it is the responsibility of the borrower to propose a prepayment plan whereby the mortgagee can get the benefit of his bargain under the terms of the note. *See id.* at 66 n. 1, 468 A.2d at 461 n. 1 (quoted above). Even if this burden does not include the actual calculation of the requisite yield maintenance fee, it does require at the least an expression of willingness to pay such a fee.

Other courts have also held prepayment restrictions in the commercial context to be enforceable and not violative of the policy against restraints on alienation. This Court, per Judge Fisher, so held under New Jersey law. *See Clover Square Associates v. Northwestern Mutual Life Insurance Co.*, 674 F.Supp. 1137 (D.N.J.1987). Judge Fisher in *Clover Square* ruled:

> In refusing to allow prepayment, and thus extinguishment, of the mortgages, [the bank] merely exercised the rights it had previously sought and obtained in the agreements. Although [the bank's] refusal to allow prepayment of the mort-

gages may have hindered [the borrower's] ability to sell its property, its exercise of a legitimate right cannot be said to constitute an unreasonable restraint on alienation.

*Id.* at 1139.[22] *See also First National Bank of Vicksburg v. Caruthers*, 443 So. 2d 861, 864 (Miss.1983) (overruling *Sanders v. Hicks*, 317 So.2d 61 (Miss.1975)); *Sonny Arnold, Inc. v. Sentry Savings Ass'n*, 633 S.W.2d 811, 815–16 (Tex.1982); *Arthur v. Burkich*, 131 A.D.2d 105, 107–08, 520 N.Y. S.2d 638, 639–40 (1987) (stating that the rule even applies in a residential context).

In the case at bar, the Court determines as a matter of law that Warrington was unwilling to pay a yield maintenance fee and that Warrington, through Whyman, clearly expressed this unwillingness to Aetna and Aetna's agent, Lattimer & Buck. This conclusion follows inescapably from the deposition of Whyman, Warrington's own principal, *see* Whyman Deposition, at 41–49, and is further supported by Whyman's letter to Aetna dated December 23, 1986 (quoted above). Thus, contrary to Warrington's assertions, it was Whyman's misinterpretation of the applicable law—and not Aetna's refusal to allow prepayment without a yield maintenance fee—that was the proximate cause of whatever damages Warrington sustained. Because Warrington indisputably did not offer to pay Aetna the yield maintenance fee to which it was entitled, and took issue with a suggestion that it would have to pay such a fee, Aetna will prevail on its motion.

## II. Did Warrington Comply With Prepayment Procedures?

■ An alternative ground for granting Aetna's motion is that Warrington did not comply with the Aetna procedures for prepayment requests. As noted above, Aetna required such requests to be in writing and accompanied by a $500 processing fee.

---

**21.** *See also Hartford Life Insurance Co.*, 283 Or. at 301, 583 P.2d at 1127.

**22.** The *Clover Square* ruling even implies that New Jersey law does not recognize the pro-borrower dicta of *Mahoney* that allows a borrower to sell mortgaged property in violation of a

prohibition on prepayment as long as the borrower pays the noteholder/mortgagee a fee to compensate it for lost earnings. Of course, *Mahoney* states the relevant Pennsylvania law that this Court must apply. The Court will recognize and apply the *Mahoney* dicta.

Aetna also required various information about the property and, in the case of a proposed sale, a copy of the executed sales contract. Warrington complied with none of these procedures. Nor did Warrington comply with the procedures specified in ¶ 8 of the Note for prepayment after the eleventh year, which by implication would be applicable to prepayment before the eleventh year.

 Moreover, even if Whyman had done so, Aetna would in all likelihood not have been able to process the prepayment request in time for the December 31, 1986 deadline set by Warrington. Because of the rush of such requests in the late months of 1986, Aetna was physically unable to process all such requests. Accordingly, Aetna set an eminently reasonable deadline of December 15, 1986 for the receipt of all prepayment requests sought to be processed by the end of 1986. Warrington objects to Aetna's "unilateral" imposition of this deadline. Yet in light of its right to 60 days' notice for prepayment requests, Aetna was certainly entitled to impose a 16–day deadline. As noted, this deadline had already expired by the time Whyman first approached Aetna on December 17, 1986. Warrington cannot successfully object to Aetna's failure to give Warrington notice of the December 15 cutoff at some time before that date.[23] With hundreds, probably thousands, of notes and mortgages in its portfolio, and no way of knowing that Warrington was negotiating to sell its property before the end of 1986, there is no basis for imposing on Aetna an obligation to notify Warrington of the impending December 15 cutoff by some prior date.[24] Counsel for Warrington even conceded this at oral argument. Warrington can hardly contest the reasonableness of this deadline as a matter of law. Importantly, ¶ 8 of the Note required Warrington to give Aetna 60 days' notice for a refinancing after the eleventh loan year. Of course, the Note did not establish a notice provision for a refinancing before the elev-

enth year because it prohibited refinancing during that period. Having determined that Pennsylvania law nevertheless allowed Warrington to prepay the loan before the end of the eleventh year as long as it paid the necessary yield maintenance fee, the Court cannot ignore the fact that the parties agreed to 60 days' notice for a refinancing before the eleventh year. As a matter of law, therefore, the lower time limit for reasonable notice by Warrington to Aetna for a refinancing request during the first 11 years would be 60 days. Warrington gave only 14 days' notice to Aetna. Therefore, as a matter of law, Warrington did not comply with the contractual notice provisions that are implicitly applicable to prepayment before the eleventh year.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment will be granted. Plaintiff's cross-motion will be denied.

---

**23.** *See* Moegenburg Deposition, at 24.

**24.** In contrast, Aetna may have had such a duty with respect to any borrowers who had notified Aetna of their intention to prepay by the end of 1986 or had at least inquired of Aetna about the possibility of doing so.